ANN WAPLES, administratrix of WOOLSEY WAPLES, deceased, deft. below appellant *vs.* WILLIAM D. WAPLES, GEORGE HICKMAN and LEWIS WEST, complainants below, respondents.

Chancery has jurisdiction to inquire into awards though made on a reference in a court of law, on the ground of fraud on the referees discovered after judgment on the award.

Judgments on awards are as obligatory as judgments after verdict.

Where two courts have concurrent jurisdiction and one of them is in possession of the cause, it ousts the other.

Whether interest on arrears of an annuity is not allowable in certain cases. *Quere?*

APPEAL from the decree of the chancellor. Sussex.

*Judge Robinson* did not sit, having been of counsel below.

This was a bill to set aside an award on the ground of fraud practised on the arbitrators. The chancellor *(Johns, jr.)* decreed, on the 18th of March, 1833, "that the award made in this case and the judgment rendered thereon were procured by the fraud of the said Woolsey Waples, the defendant," and that "the aforesaid award and judgment so fraudulently obtained be and the same hereby are declared to be null and void." And he also decreed an account. From this interlocutory decree the defts. appealed.

The case was this: The deft., Woolsey Waples, having purchased of a certain Samuel White a farm in which he, together with his brothers, Philip and James White, were equally interested, executed to the said Samuel White three several bonds with warrant of attorney to confess judgment thereon, upon which judgments were severally confessed on the 22d September, 1812, each for the real debt of $901 53, with interest from the 21st July, 1811. These judgments all stood in the name of Samuel White, but one of them was indorsed for the use of *Philip* White, and another for the use of *James* White, both of whom were infants under the age of twenty-one years, and for whom Samuel White acted, though he never was appointed, as guardian. Woolsey Waples made several payments to Samuel White on account of these judgments, and took receipts therefor, without designating to which judgment they were to be applied; one of $162 27, dated first July, 1813; one of $50, 11th July 1815; one of $126 22, 23d August, 1815, and one of $196 85, dated 30th August, 1815. On the 30th October, 1815, Samuel White, for a full and valuable consideration, assigned his judgment against Woolsey Waples to William D. Waples, one of the complainants, representing at the time that nothing had been paid upon it by the said Woolsey.

Between that time and the 21st of August, 1819, Woolsey Waples made six payments on account of said judgment to William D. Waples, the assignee, amounting in the whole to $1019 10, and leaving a balance unpaid of about $292: on the last mentioned day William D. Waples, assigned the balance of said judgment for a valuable consideration, to Hickman and West. Philip White having come of age, to wit: on the 15th September, 1816, called on Woolsey Waples, for a settlement of his judgment; and on this settlement Waples produced all the receipts aforesaid, for payments made to Samuel White, which Philip, ratifying the acts of his acting guardian, allowed as against his own judgment. Waples made a further payment on that day to Philip White and took a general receipt for $851 85, *including all these previous receipts*; but *he did not give up those receipts.* The balance still due on Philip White's judgment was ascertained on that day to be $324 85. Both Philip and Samuel White shortly after left the state and have never returned. Hickman and West sued out a scire facias on the judgment assigned to them as aforesaid, returnable to the November term, 1820, which was afterwards referred by the consent of parties to the prothonotary and two other persons named by them "to ascertain whether any, and if any, what sum is due plaintiff, and judgment to be entered according to said report." On this reference the deft. Woolsey Waples produced and claimed as credits to *this* judgment the receipts afsd. of Samuel White for $162 27, $50 00, $126 22, and $196 85, which were *allowed* by the referees; and they reported that there was nothing due on said judgment. Judgment nisi was rendered on this report at the May term, 1823. Whereupon, Hickman and West re-assigned their judgment to William D. Waples. Proceedings were afterwards instituted on the *third* judgment of Samuel White, being the one marked for the use of *James* White against Woolsey Waples; and, he having died, his administratrix took steps to ascertain what had been paid on account of that judgment. The matter was referred to arbitrators and at the hearing *all* the receipts were produced; when the *settlement* receipt of 15th September, 1816, for $851 85 being recognized as in the hand writing of Jacob Prettyman, who was present at the settlement and made the calculations it led to an explanation of the whole transaction. It then appeared that the receipts afsd. allowed by the referees in the case of Hickman and West, were applicable to Philip White's judgment and that Woolsey Waples had previously obtained credit for them *on* that judgment. Neither William D. Waples nor Hickman and West knew of these circumstances until after the last reference in the year 1829.

*Layton* for the appellant contended that the court of chancery had not jurisdiction to inquire into this award. Another court having full jurisdiction was in possession of the cause; it had been submitted by a rule of reference under the sanction of that court to referees chosen by the parties, and a report had been made and judgment rendered on their award. The court of chancery has no power to review this decision. He cited in support of this position, 1 *Mad. Ch'y* 295, 298; 2 *do.* 713, 14. Also the case of *Pratt* and *Kinsey*

50

vs. *Bradun* and *Rice* decided in the late High Conrt of Errors and Appeals of this state in 1811; and the case of *Beeson's adm'rs* vs. *Beeson's ex'r.* in the same court, at the June term, 1831. *(a)*

Courts favor awards. They tend to the speedy and amicable set-

*(a)* Joseph Beeson and Thomas Beeson, administrators of Thomas Beeson, deceased, defendants below, appellants, *vs.* John Elliott, executor of Rebecca Beeson, deceased, plaintiff below, respondent.

High Court of Errors and Appeals, June term, 1831.

Appeal from the decree of the chancellor.

Present, Harrington, chief justice, Rowland, Davis and Dingle, justices of the Supreme Court, Clayton, Chief Justice, and Stout, justice Common Pleas, (Cooper, Justice, absent.)

This cause stood upon a case stated in the nature of an injunction bill. It was agreed upon in chancery as a substitute for a bill and answer.

"Thomas Beeson, senior, by will, dated in 1787, devised his land &c. to Jonathan and Thomas Beeson, his sons, and bequeathed to his wife, Rebecca Beeson, an annuity of forty pounds per annum, payable quarterly, in bar of dower, and charged it upon the real estate so devised to his sons, and also upon his personal estate. He also gave his wife the use of two rooms in his house, with certain other privileges. He died 22d March, 1790. The annuity, &c. were accepted by the widow in bar of dower. In 1790 she removed from the house and resided with her two sons in the country until 1792, when she went to live with her son-in-law, Elliott, the defendant, with whom she lived till her death. On the death of Thomas Beeson, sen. the house, &c. in which these privileges were granted came into the possession of Jonathan and Thomas Beeson, the sons, and remained in their possession, without any agreement with their mother about compensation for her relinquishing the use of them, until March, 1799. At that time Jonathan and Thomas being about to sell the house, each executed to the widow a bond for the payment of twenty dollars, annually, for her privileges therein. In 1814, Rebecca and Thomas Beeson having differed about the arrears of her annuity of forty pounds, and the arrears of the said bond annuity of twenty dollars, entered into an amicable action in the court of common pleas for Newcastle county, referring all matters in variance between them to three arbitrators, who unanimously awarded in favor of Rebecca Beeson the sum of $993 23, and judgment was rendered on their report. The arbitrators allowed interest on the annuity of $40, and also allowed a compensation for the widow's privileges in the house from 1793 to 1799, during which time they were relinquished for the benefit of the heirs. Rebecca Beeson died in 1821, made a will, and the deft., Elliott, is her executor. Thomas Beeson, jr. died in 1825. Complainants are his administrators.

Upon hearing, the chancellor dismissed the case stated in the nature of a bill, and ordered the costs to be paid equally by the parties. Whereupon an appeal was prayed and granted.

*Mr. Rogers,* for appellants. The use of the rooms was a personal privilege to Rebecca Beeson, which she might avail herself of or not at her pleasure. The non-user gave her no claim upon the heirs unless there was a contract to that effect. The arbitrators, therefore, committed a mistake in law by allowing her a compensation for these rooms previously to 1799. Second. The arbitrators made another mistake in law, by allowing interest on the annuity of forty pounds. Annuities do not carry interest. That point is now well settled in England. 3 *Brown, ch.* 489, 495-6; 1 *Sch. &. Lef.* 301; 4 *Brown, ch.* 416. If this be the law, the question arises, can the court of chancery give relief against this mistake? We don't contend that a court of chancery will in all cases inquire into awards, but if there be a mistake in law it will interfere. Chancery has a general jurisdiction over

tlement of disputes. The causes for setting them aside must be for matter apparent on the face of the award, or improper conduct on the part of the arbitrators. The court will not strain an inference of

awards, and the fact that a party may object to the award in the court below does not oust chancery of its jurisdiction. Jurisdiction of chancery not ousted by arbitration under statute 9 and 10, William III. 2 *Vezey, jr.* 451. The statute of William is equally full with our act of assembly. The general jurisdiction of the court being established, was this a proper case for its exercise? The grounds for impeaching awards are—corruption, misbehavior, excess of power, and a mistake in fact admitted by the arbitrator. Awards contrary to law may be impeached; for that is excess of power. An award will be set aside for a mistake in law. 2 *Vezey, jr.* 15; *Bunbury,* 265; 3 *East.* 18; 9 *Vezey, jr.* 364; 13 *East.* 357. There is a distinction between the reference of a distinct question of law and the reference of all matters to be decided according to law. In the latter case a mistake may be corrected, though not in the first. The chancellor therefore erred in dismissing the bill for want of jurisdiction.

*Mr. Archibald Hamilton,* for respondents. The relinquishment of the use of the rooms was for the benefit of Jonathan and Thomas Beeson, and they set their own estimate upon this benefit by each giving the widow a bond for twenty dollars per year. The arbitrators might well presume a contract before this period, and it was just that they should allow a compensation. Second. It is not settled that interest shall not in any case be allowed on an annuity; on the contrary, where the annuity is for maintenance, in bar of dower, &c. it has frequently been allowed. And it is equitable that it should be allowed. It appears, then, that the referees have made no mistake; they have allowed interest in a case where by law it was allowable. But I take the rule to be, that the court will not set aside an award for a mistake of law on a doubtful point: only upon a plain and palpable mistake of the law. 2 *Atk.* 211; 3 *Atk.* 579; *Talb. cases,* 2; 1 *P. Wms.* 543; 2 *P. Wms.* 163; 1 *Vez. jr.* 452; *Stidham's adm'x.* vs. *Shields, Chy. N. C. C.;* 3 *Atk.* 494; 1 *Vez. jr.* 370; 2 *do.* 16; 6 *Taunt.* 378; 2 *Barn. and Ald.* 291.

There being no ground for setting aside this award, admitting chancery had jurisdiction, it is unnecessary to go into a particular examination of the jurisdiction of this court over awards. In many matters it is concurrent with the common law jurisdiction. But where two courts have concurrent jurisdiction of a cause, the court which is first possessed of the cause ousts the other's jurisdiction. Upon this principle the decree of the chancellor was correct. 3 *Burr* 1258; 9 *Vezey, jr.* 67; 2 *Atk.* 162; 3 *do.* 529; 2 *Vez. jr.* 21; 1 *Atk.* 63. In the case of *Crane's administrator* vs. *Lowber,* in chancery, New Castle county, there was a decree setting aside an award, and, upon appeal, this court reversed the decree, upon the ground that the court of common law to which the award was returned had full jurisdiction, and being possessed of the cause, ousted the jurisdiction of chancery. The parties here are also barred by an acquiescence in the award and judgment for eleven years. It is now too late to enquire into it.

*Mr. James Booth,* in continuation for respondents. This is the case of a father devising a considerable property to his two sons, and directing them to pay an annuity of forty pounds to their mother, in lieu of dower, and also giving her the use of two rooms in his house, with certain other privileges. The annuity was left unpaid. The parties referred all matters in dispute in relation to the widow's claim under the will, to three intelligent referees, who awarded for the annuity and interest, and a compensation for the use of the rooms, which was relinquished to the sons. The house was sold by them. It is a strong case therefore against the application to set aside the

fraud; it must be apparent and flagrant.   The complainants have succeeded in mystifying this case and throwing a suspicion over it by a confused introduction of the three judgments and the numerous re-

award, after the lapse of eleven years, not on the application of the sons and devisees who have acquiesced in it, but of their children.   What are the grounds of this application?  First.  The allowance of compensation for the use of the rooms.  Did not Thomas Beeson himself acknowledge the justice of this claim and fix the amount of it by giving his bond to his mother for the payment of twenty dollars per annum?  Jonathan and Thomas Beeson had the use of these rooms and the benefit of the relinquishment by their mother.   Second.  Mistake in law in the award by allowing interest on the annuity from 1791.   I have heard no reason why interest should not be allowed on an annuity, but we are only cited to cases.   Those from 3 *Brown* 495, and 1 *Schoales and Lefroy* 301, are the principal ones.   These cases only decide that interest is not allowable except in very particular circumstances which is all we contend for.   The principal running through all our cases is, that where the annuity is the bread of the widow, interest is allowable.   There is no fixed and unyielding rule on the subject which may not be controlled by peculiar circumstances.   But suppose this a doubtful matter, and it be doubtful whether the arbitrators did right, we contend that chancery would not interfere to set aside their award.  We don't contend that there is no case in which a Court of Chancery would set aside an award; we admit its general jurisdiction over awards; but the jurisdiction of our Courts of Chancery is essentially different from that of the English courts.   In England there are two kinds of awards: upon reference out of court by parol or by bond where no suit is pending; and upon the reference of a cause in court.   The statute of William, places them on the same footing. I incline to the opinion that the statute of Wm. is not in force here.   Our awards are of the first kind; regulated by our act of assembly.   I contend that judgments on awards under that act are equal to judgments rendered on the verdict of a jury.   Our law is the same with the Pennsylvania statute, which, under their construction of it, gives great force to awards.  The principle then is that Chancery will not exercise its extraordinary powers to set aside a judgment upon an award, except upon a case disclosing such peculiar circumstances as would authorize its interference in the case of a judgment rendered on the verdict of a jury.   Our law directs that a party shall be remitted to common law where there is a sufficient remedy there.   The complainants here had a full remedy at law to set aside this award if it were wrong.   Corruption of arbitrators, fraud or collusion of parties, admitted mistake of facts &c. are proper grounds for setting aside awards.   *Digest* 103; 1 *Sch. & Lef.* 206; *Ky'd. Awd.* 327; 1 *Bac. Ab.* K. 239, *Wils. Ed.* The result of all the cases on the subject of interest is, that generally it will not be allowed for arrears of an annuity, but it is discretionary and under particular circumstances especially where it is for the maintenance of a widow or child, in bar of dower, where it is charged on real estate or secured by bond on the personal, the court has frequently allowed it.

*Mr. James. A. Bayard*, for appellants, in reply:
There have been conflicting opinions in our courts relative to awards.   In *Pratt* and *Kinsey* vs. *Bradun* and *Rice*, this court, in 1811, affirmed the chancellor's jurisdiction, though there have been decisions looking the other way.  We may at least say that the question of jurisdiction is *open*.  First. The court of chancery has jurisdiction in cases of awards either in pais or upon the reference of a cause in court.   Its common law jurisdiction before the statute of William is unquestionable.   This jurisdiction can't be taken away by inference—it must be expressly denied.   Is there any thing in our

ceipts applying to them; yet it is by no means certain that there has been either fraud or mistake in the case. At this distance of time; after the matter has long since been settled by the final action of a

statute which does take it away. The power given to the courts of law is the extension of a beneficial principle, gives a concurrent remedy, but it does not oust the jurisdiction of chancery. The stat. Wm. did not oust chancery jurisdiction; *Bunb. R.* 265; does our act of Assembly? The courts, therefore, of common law and of chancery have both jurisdiction over awards; they proceed in different modes, but they inquire into them upon the same grounds. The doctrine of concurrent jurisdiction and first possession of the cause does not apply because the Court of Common Pleas never had possession of this cause. There was no application to that court to set aside the award. There is a distinction as to jurisdiction where the objection to the award appears on the face of it and where not, but this distinction has not been taken in our state. Our courts will all inquire dehors the award. What are the grounds, then, of impeaching awards? Four,—corruption; misbehavior; excess of power, which a mistake in law is; and a mistake in fact admitted by the arbitrator. The only ground here alledged is the excess of power, to wit: a decision against law. On a general reference the court will correct a mistake in law; but not on the reference of a particular question of law, or where the general reference is to lawyers, in which cases it will be inferred that the parties specially constituted the referees the judges of the law. 2 *Vez. jr.* 15; 9 *ditto* 364; 1 *ditto* 370. This is the principle, that on a general reference to persons not lawyers the court will correct their mistakes as to law, and whether the mistake is upon a clear or a doubtful, (that is, *difficult)* point of law the court will equally correct it. There may be a distinction between an evident or doubtful mistake; and a mistake upon a clear or difficult point; in the latter it can never be doubtful whether the arbitrator made a mistake if the point of law decided is known. The decision of the court removes all doubt as to the law. The referees decided against law on two points; first, in relation to the use of the rooms; and secondly, by allowing interest on the arrears of annuity. Examines the cases. The cases in P. Wms. are against us, but they are overruled by the great case of *Tew* vs. *Lord Winterton* where all the cases are reviewed. 3 *Brown Rep.* 389; 1 *Vez. jr.* 451, *S C.*; 4 *Brown* 316, 321; 1 *Sch. & Lef.* 301. The strongest case on the other side is the one cited from Barn. and Ald., (2 *Barn. & Ald.* 691.) which is a late case, but it refers to a matter of practice only, and not a general rule of law. As to the delay, I understand the doctrine of acquiescence to be in equity the same with limitation at law, twenty years. Third. We contend that our act of Assembly opens the door to inquiring into awards wider than it was at common law, or under the statute of William. It places awards on the ground of verdicts, and renders them liable to be set aside upon the same ground that would authorize the setting aside a verdict or granting a new trial.

His honor the *Chancellor* (*Johns*) now assigned his reasons for his decision in the court below:

He remarked that he considered the question of allowing interest on an annuity not to be settled in Delaware, if it be in England. The cases there are conflicting. His opinion was that the allowance of interest is discretionary, to be decided on the particular circumstances of each case. This annuity was for maintenance; and he thought the arbitrators exercised a good discretion in allowing interest. In their calculation of interest it did appear to him that they had made a mistake against Rebecca Beeson. Admitting the general jurisdiction of chancery over awards, the chancellor thought that this was not a proper case for his interference. But he thought

court of justice, and after the only party having a perfect knowledge of the whole case is dead, it cannot be expected that we can give a perfect explanation of all the circumstances connected with it.

the court of chancery had no jurisdiction over this cause; because Thomas Beeson had a sufficient remedy at law, and the Court of Common Pleas having possession of the cause ousted the jurisdiction of chancery, This point was flatly decided in *Crane's ex'r.* vs. *Lowber*, in this court. He considered himself bound by this decision, whatever might be the English law. The chancellor remarked that the law of awards had been much changed since the fourth of July, 1776. Our own independent laws, and indeed the condition of independence itself had necessarily produced many changes. He was not certain whether the statute of William had been adopted here, but thought that the statute 18 Geo. 2, was intended as a substitute for it. He cited a great number of cases on awards, which had been decided in the courts of this state, particularly *Pratt* and *Kinsey* vs. *Bradun* and *Rice;* and *Crane's adm'r.* vs. *Lowber's adm'r.* The first of these cases recognized the general jurisdiction of chancery over awards; and the latter denied it in a case where a court of law had concurrent jurisdiction and was possessed of the cause.

Chief Justice *Harrington* delivered the opinion of the court.

HARRINGTON, *Chief Justice:*

"The important preliminary point to be decided in this cause is the question of jurisdiction of the court of chancery over awards generally and over the award in this case in particular. The common law jurisdiction of courts of chancery in England previously to the statute of ninth and tenth William third, over awards in the ordinary cases of corruption, misbehavior, excess of power and mistakes of fact admitted by the arbitrator, is conceded; and it seems by the cases in *Bunbury* and *2d Vezey, jr.*, that this jurisdiction was not ousted by that statute, though it gives to awards a more obligatory force than they had before. But we apprehend that awards in this country, or rather judgments after awards, stand upon a very different footing from awards in England, both from the nature of the proceedings under them, and also by force of our acts of assembly regulating those proceedings, and giving to them their obligatory character and efficacy. In England it is not necessary that the arbitrators should act under the obligation of an oath; nor even that the witnesses should in all cases be subjected to that test of truth which is invariably applied in all our judicial proceedings; but the great distinction is, that in that country the award is not followed by the action of a court of law rendering upon it judgment of confirmation or reversal. Here the mode of proceeding is in all respects similar to that in a court of justice; it is in fact the substitution of three or more referees in place of a jury, and it is invariably followed, (we speak now of references under a rule of court,) by the inspection and adjudication of the court, which examines into the regularity of the proceedings of the referees, hears any objections which may be made to the award, and renders judgment thereupon. It in fact assumes and adopts the act of the referees as its own, making it the basis of its own judgment. There is therefore much reason arising from the nature of the proceeding for giving to the judgments of our courts upon awards a superior force to awards in England. It is, as regulated by our laws, an extremely beneficial mode of settling disputes, affording to the parties a convenient, speedy and cheap means of obtaining justice; and we apprehend that the policy of our law is to favor awards, and that the true intention and design of our several acts of Assembly is to place them upon the same footing with the verdict of a jury in all cases where they are approved and confirmed by the judgment of a court. As it regards there-

Doubts may arise on the whole case of the fairness of the transaction, but the court will not, on a mere doubt, disturb matters so long settled; much less will they presume a transaction fraudulent because it

fore the general jurisdiction of Chancery in this state over judgments on awards it is the strong inclination of this court to confine it to those cases where the court of chancery is authorized to examine into and decree upon the judgment of a court of common law rendered upon the verdict of a jury. There may be certain other cases where from fraud, corruption or misbehavior in the arbitrators it might be necessary to make them parties in equity to obtain a discovery, and in which an extension of the jurisdiction of the court of equity over awards beyond the limits here assigned, might be allowed.

In this particular case, upon this principle, and for the additional reason that there was sufficient and ample remedy in the Court of Common Pleas, which court being possessed of the cause and competent to give full relief, superseded and ousted the jurisdiction of chancery, and upon the authority of the case of *Crane's adm'r.* vs. *Lowber's adm'r.* heretofore decided in this court, we are unanimously of opinion that the court of chancery had not jurisdiction to inquire into and set aside this award, and consequently that the decree of the chancellor dismissing the case stated in the nature of a bill, ought to be affirmed.

But supposing the chancellor had jurisdiction to inquire into this award, was there sufficient ground of objection appearing to him and now to this court, to authorize the setting it aside after the lapse of so great a time, and so long an acquiescence as has occurred in this case.

The great objection urged in the argument of the cause is, that the arbitrators allowed interest on the arrears of an annuity which it is alledged is contrary to the rule of chancery now settled in England; and it is contended that this mistake of the law was a sufficient ground to set aside the award, it being an excess of the powers delegated to the referees. It cannot be denied that the English decisions on the subject of allowing interest on arrears of an annuity are variant and conflicting, nor that there are cases where interest has been allowed, particularly where the annuity was for the maintenance of the annuitant; and the rule of the English law is at least so far doubtful as that this court would be induced to give it a much more deliberate consideration than we now have, in a case requiring a decision of that question. Some of the later cases would seem to establish a rule against the allowance of interest; excluding the consideration of the peculiar circumstances arising in each case on the ground that circumstances of commiseration or hardship are too indefinite and unlimited as reasons for departing from a great rule of equity. But doubtful as it is whether the law be now absolutely settled in England against the allowance of interest on annuities we may at least affirm that no such rule is *settled* in this state; for giving to the decisions of our court of chancery only that authority to which they are unquestionably entitled, they go to establish a different principle from that which we have supposed the later decisions in England seem inclined to establish. Our Court of Chancery has more than once decreed interest on annuities; and particularly in the case of *Unity Buckmaster's adm'r.* vs. *Charles Buckmaster* and *Charles Hamm,* which was a bill for the arrears of an annuity granted by the will of Thomas Buckmaster to his widow, and charged upon his real estate. The court of chancery in Kent county, did, in 1829, decree the arrears of the annuity with interest from the death of the testator, and that against a purchaser of the land charged. In Walcott's administrator against the same defendants for another annuity under the same will, interest was also allowed; though the amount in this case was agreed upon by the parties, who allowed interest on the authority,

is not now susceptible of the clearest explanation.    Second.  The decree in this case is erroneous because there are not proper parties to the cause.    The decree is in favour of George Hickman and Lewis West, who, with William D. Waples, are the parties complainant, but who have not a particle of interest in the suit.    Hickman and West had given up their interest in the judgment, and re-assigned it to William D. Waples before the bill was filed.

*Frame, Attorney-general,* for appellee.    The taint of fraud always abides and will vitiate a transaction wherever and whenever it is discovered.    I am aware that when parties submit their cause to arbitrators; judges of their own choosing, their decision should not be slightly interrupted.    If such a judge, so chosen, should commit an error either in law or fact, even a plain mistake; if it be free from fraud or collusion the court of chancery would not relieve against it.  I agree also that our courts have gone great length in sustaining awards; and though the jurisdiction of chancery over them has been conceded, it has been confined within narrow limits *(Beeson's adm'rs. vs. Beeson's ex'r.)* but these limits are wide enough to embrace a case of glaring fraud—fraud not only on the party but on the referees—fraud now seen and admitted by the referees themselves.  And such a case is this.  Can it be that for such a case equity has no relief?  The rules on the subject of inquiring into and setting aside awards in England are somewhat confused on account of the different kinds of awards in use there.    There are three kinds—first, general, where the parties submit to arbitrators without calling in the aid of a court; second, where during the pendency of a suit in court the parties refer it to arbitration, and this also is a reference at common law; and third, awards under the statute ninth and tenth William, which enabled parties where no suit previously existed to refer their controversies and make that reference a rule of court. That statute expressly makes the award conclusive except in certain specified cases and within a narrow limitation of time.    That statute has never been adopted in this state; we have an act of our own of an old date, and all that is necessary for our purposes.    These several kinds of awards in England introduce some confusion in the books, as in the passage cited from *Maddock,* 295, 8.    In such cases awards under the statute are always meant, and that statute is very

perhaps, of the other case.  In this state then we may at least say that there is no uniform rule, fully settled, which in every case prevents a court of chancery, or of law, from allowing interest on the arrears of an annuity. Did, therefore, the referees in this case, by allowing interest, violate a settled and fixed principle of law, which it seems to be admitted they must have done to authorize the vacating their award on this ground?

But supposing this rule of equity settled against the allowance of interest, would not the case come within the scope of the authority cited from 2 *Barn* and *Alderson,* 691, which decides that an arbitrator is not bound by a rule of practice adopted by the courts of law for general convenience. In that case the arbitrator allowed interest against the uniform rule of court, and it was held not to be a sufficient ground for setting aside his award. The reasoning of the learned judges in deciding that cause is very strong in its application to the present case, as well as the point actually decided.

The decree of the chancellor was unanimously *affirmed.*

different from our act of Assembly. As to that act placing awards on the footing of verdicts, it can't effect the question because fraud equally vitiates a verdict and can be relieved against. 1 *Dall.* 314; *Kid.* 34, *n. a.; Caldwell on Arbitration,* 16, 17, *b.; Stat. Wm. Id.* 184; *Kid.* 327 to 330, 354, 358; 2 *Hovenden on Frauds,* 240; 1 *Mad. Ch.* 296; 2 *Johns. Rep.* 361, 364; *Dig.* 112. Second. Don't think it necessary to examine at length the position that a court of law has the exclusive jurisdiction of this question. Fraud is the peculiar subject of chancery jurisdiction. I agree that where a court of law does inquire into fraud it goes on equitable principles; but the forms of proceeding in those courts do not enable them to pursue fraud to any extent. This was the origin of chancery jurisdiction. The application at law in this case was refused in limine on the ground that it was too late there and expressly because the party had a resort to equity. The general rule at law is that the court will not inquire into awards after the term at which the report is made. The proceedings are too summary there to admit of an unlimited inquiry into awards. Several years had elapsed in this case before the fraud was discovered. Third. I come to the principal question: Has the fraud been made manifest here on the proof? I do not contend that fraud shall be presumed, but this does not mean that a court in investigating fraud shall not draw conclusions from facts: this is not presuming fraud but ascertaining it. 1 *Hovenden,* 21, 18. Fourth. Were Hickman and West improperly made parties. They stood for a long time parties on the record, entitled to the judgment and might have received the money. But additionally this is only an interlocutory decree; the chancellor has full power to make further decree; and, if it be so that Hickman and West have no longer any interest in this question, he may dismiss the bill as to them.

The court *affirmed* the decree of the chancellor.

*Layton,* for appellant.
*Frame,* for appellee.